UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARRIE MEYER,

    Plaintiff,

-vs-

Case No. 06-14953
Judge Avern Cohn

MACOMB TOWNSHIP OF MACOMB
COUNTY, MICHIGAN; JOHN BRENNAN,
individually and in his capacity as Township
supervisor; and JOHN BROGOWICZ,
individually and in his capacity as Human
Resources Director, Jointly and Severally,

    Defendants.

_____/

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. Introduction

This is an employment case. Plaintiff Carrie Meyer ("Meyer") worked for Defendant Macomb Township from March 2005 to November 2005, first as a database administrator and later as the supervisor of the Fire Department Record Management System. Meyer alleges that during her employment, she was sexually harassed by fire chief Raymond Ahonen ("Ahonen"). Meyer says that on several occasions she reported the harassment to Defendant John Brogowicz ("Brogowicz"), the Macomb Township Human Resources Director, but Brogowicz refused to take action against Ahonen. She further alleges that after she continued to complain about Ahonen's behavior, Defendant John Brennan ("Brennan"), the Macomb Township Supervisor, recommended that

Meyer be terminated. Meyer was subsequently terminated by vote of the Macomb Township Board.

Meyer now brings claims under 42 U.S.C. § 1983, Title VII of the federal Civil Rights Act, and the Michigan Elliott-Larsen Civil Rights Act. Before the Court is the defendants' motion for summary judgment. For the reasons discussed below, defendants' motion will be granted in part and denied in part.

## II. Facts

### A. Background

Meyer originally applied for employment with Macomb Township as an Ordinance Enforcement Officer in December 2004. She was not offered that position, but on March 28, 2005, the Township hired Meyer to work as a full-time database administrator. The database administrator job was a newly created position covered by a collective bargaining agreement between Macomb Township and the American Federation of State, County and Municipal Employees ("AFSCME") Local 1103-C, the union for the Township's hourly employees. The collective bargaining agreement provides that new hourly employees are on probation for the first ninety days of their employment; thereafter, employees are placed on a "seniority list" and have their seniority computed from the day they began their employment. The agreement further provides that the union will not represent probationary employees in disciplinary or discharge proceedings and that probationary employees may be terminated without cause.

In June 2005, Macomb Township created a new employment position, "Fire RMS Supervisor." "RMS" refers to the Fire Department's Record Management System, a

computer database system which the supervisor was responsible for administering. The Township Board approved creation of the position on June 22, and Meyer was offered the position the same day. The offer of employment letter stated that as Fire RMS Supervisor, Meyer would become a member of AFSCME Local 1917, the union for the Township's salaried employees. The letter further stated that pursuant to the collective bargaining agreement between the Township and AFSCME Local 1917, Meyer would be subject to a probationary period of 180 days.

Article 13, Section 1 of the collective bargaining agreement between Macomb Township and AFSCME Local 1917 provides:

> New employees hired in the bargaining unit or promoted from the hourly bargaining unit shall be on probation for the first one hundred eighty (180) consecutive calendar days of their employment. After the one hundred eighty (180) day period, the employee shall enter on the seniority list and his seniority shall be computed from the date of his employment or promotion into the bargaining unit.

Article 13 further provides that "[p]robationary employees may be disciplined, laid off, or terminated without recourse to the grievance and arbitration procedure provided for herein" and that "[t]he employer shall have sole discretion in matters of discharge and discipline affecting probationary employees."

### B. Meyer's Testimony and Notes

Meyer kept detailed, contemporaneous notes of various events at the office while she was employed by the Township. Meyer says that she was in the habit of keeping such notes because she had been involved in a prior employment lawsuit. Her opposition to the defendants' motion relies heavily on these notes, which she testified in her deposition are truthful and accurate to the best of her knowledge. The contents of

3

the notes, which run more than eighty pages of single-spaced type, are summarized below.

## 1. Employment with Macomb Township

Meyer worked at Macomb Township's Fire Station Two. Her workspace was a folding chair and table placed in the corner of the lunchroom at the station. On May 10, 2005, Meyer attended a meeting with Brogowicz; Ahonen; James Koss, the Township Information Technology Director; and Richard Koss, a Captain in the Fire Department. (James Koss and Richard Koss are not related.) The purpose of the meeting was to discuss the implementation of the Record Management System, Meyer's primary employment responsibility. According to Meyer's notes, Brogowicz stated at the meeting that it would take approximately one year to implement the Record Management System. Meyer says that, at the time, she lacked access to certain performance tracking data that was in the possession of Richard Koss. Meyer's notes further indicate that Ahonen stated at the meeting that she was doing "a good job" and that the Township agreed to provide her with a computer and filing cabinets.

Meyer met again with Brogowicz on June 3. Brogowicz told Meyer that he was pleased with her work and that she was being considered for a promotion.

On June 8, Ahonen asked Meyer to remove certain data regarding firefighter training from a spreadsheet that she maintained. Ahonen told Meyer that the data could be seen as indicating that his own training and the training of some other firefighters was inadequate, and that he wanted the data removed to avoid problems with Brennan. Meyer complied with Ahonen's request. In the course of discussing the matter, Ahonen

grabbed Meyer's arm and made her promise not to tell Brennan about the changes to the spreadsheet.

On June 16, Meyer met with Brogowicz and Brennan. This was the first time that Meyer and Brennan had met. Brogowicz informed her that she would be promoted to a supervisory position, and Brennan encouraged her to accept the promotion. The Township Board approved Meyer's promotion to Fire RMS Supervisor at a meeting held on June 22. At the meeting, Brennan praised Meyer's job performance.

### 2. Ahonen's Harassment

On June 8, Meyer noticed that Ahonen was "starring [sic] at [her] breasts" during the course of a work-related conversation.

Ahonen asked Meyer out to dinner on June 13. According to her notes from that day, Ahonen "star[ed] at [her] chest all the time." Meyer also says that Ahonen asked questions about her personal life, and when he didn't get "the response he want[ed]," sometimes became angry or hostile.

Meyer reports that she complained to Brogowicz about Ahonen's harassment on June 28. Brogowicz tole Meyer he had previously received a number of complaints about alleged sexual harassment, but that Ahonen was "pretty much untouchable" because of his close relationship with Brennan. Brogowicz also said that he had a thick file detailing previous allegations of sexual harassment by Ahonen.

On June 30, Ahonen was speaking to some firefighters in the lunchroom with Meyer present. Ahonen said that a nurse who recently treated him "was stacked just like Carrie" and made a gesture that simulated fondling a woman's breasts. Meyer

5

confronted Ahonen about his behavior later the same day; Ahonen was not receptive and told her that Brennan would never take her word over his own.

The next day, July 1, Ahonen again asked Meyer to dinner. Meyer proffers a memorandum that she says she wrote to Ahonen the same day. The memorandum is largely concerned with Meyer's request to move her workspace in order to minimize glare from her computer screen, as she had been having vision problems. The memorandum also makes reference to Ahonen's "inappropriate comments and gestures" and says "I just want you to stop."

After a staff meeting on July 15, it was announced that Meyer would be receiving new office space. Meyer's notes recount that someone commented to Ahonen on the matter, and he replied that Meyer must have been romantically involved with Brennan.An entry in Meyer's notes dated July 20 states that Ahonen had begun to harass Meyer by turning off the lights in the lunchroom while she was working and frequently adjusting the volume on a television set in the room. The notes state that Ahonen's behavior is "ongoing and consistent."

Meyer says that she again complained to Brogowicz about Ahonen's behavior on July 22. Brogowicz advised Meyer to take her complaints to Brennan, but warned that Brennan may be reluctant to take action because Ahonen had helped Brennan during his campaign for Township Supervisor.

On August 11, Ahonen told Meyer that she would get an office only if she agreed to begin dating him. Meyer refused.

Meyer again met with Brogowicz to complain about Ahonen on August 22. Brogowicz declined to take any action against Ahonen.

On August 25, Meyer says that Ahonen came up behind her in the lunchroom, "pinned [her] against the stove," and began fondling her and rubbing his body up against her. She says the assault ended only when another firefighter walked into the room. Meyer says that she told Brogowicz about the assault and Ahonen's broader pattern of the behavior the following day, but Brogowicz told her there was nothing he could do.

On September 29, Ahonen told Meyer that if she kept quiet about the August 25 incident, Meyer could pick out whatever office she wanted and Ahonen would personally see to it that she got it.

On October 4, Meyer met with Brogowicz; Brennan; Larry D'Loski, the Township attorney; and David Koss, the Township water and sewer superintendent. (David Koss the brother of Richard Koss, the Fire Department Captain.) At the meeting, Meyer complained about Ahonen's behavior, but said she felt uncomfortable discussing the details in front of David Koss, who was also her union steward.

Later the same day, Ahonen confronted Meyer about the meeting, appearing angry because Meyer had complained about his behavior. When Meyer tried to leave, Ahonen grabbed her wrists and the two engaged in a brief physical struggle. Meyer retreated to the women's bathroom and emerged only when she heard other voices outside the door.

### C. Other Testimony

Beverly Schnell, another township employee who worked at Station Two, testified that Meyer would sometimes ask her to stay at work in order to avoid being left alone. Schnell assumed that Meyer was apprehensive about being alone with Ahonen,

7

although Meyer never directly stated her reasons. Schnell stated that Meyer's "working conditions were horrendous." The lunchroom in which Meyer worked was often noisy and the mostly male staff at Station Two would engage in "guy talk" and tell "off-color jokes." Additionally, after Meyer had been terminated, she told Schnell about the October 4 incident during which Ahonen grabbed her wrists. Meyer also told Schnell that after Ahonen resigned from the fire department, he had been following her. Schnell says that Meyer found this "unnerving."

Brogowicz and Brennan testified that Meyer frequently complained about her working conditions, but never complained of sexual harassment or any similar behavior on Ahonen's part.

### D. Meyer's Termination

Ahonen resigned his position with the fire department on October 5.

On November 17, Brennan met with Meyer, Brogowicz, and two other fire department employees. Brennan inquired into Meyer's progress in implementing the RMS software. Brennan indicated that Meyer's response was unsatisfactory and that she was being suspended without pay, pending Brennan's request to the Township board that she be terminated. Meyer was told that the final decision would be made at a Board meeting in a few days' time, and that she would be allowed to address the Board. Meyer was provided with a written notice of the suspension.

The Board met on November 23, 2005, and among other business approved Brennan's recommendation that Meyer be terminated. Meyer addressed the meeting and raised numerous complaints related to her employment. Meyer cannot recall whether she raised the issue of sexual harassment. The minutes of the meeting

8

indicate that Meyer complained about her working conditions but do not specifically mention the issue of sexual harassment.

### III.  Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50.  Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must

prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

### IV. Analysis

#### A. Admissibility of Meyer's Notes

In her opposition to defendants' motion, Meyer relies heavily on her typewritten notes of various events that occurred at her workplace. Defendants argue that these typewritten notes are inadmissible hearsay and that Meyer therefore cannot use them to create a genuine issue of material fact. At the summary judgment stage, the focus is on the admissibility of the contents of evidence, not its form. North American Specialty Ins. Co. v. Myers, 111 F.3d 1273, 1283 (6th Cir. 1997). Here, the information contained in Meyer's typewritten notes could plausibly be admitted at trial in several ways: Meyer could testify to the relevant portions of the notes from her personal knowledge under Fed. R. Evid. 602; if Meyer's memory fails, the notes could be used to refresh her recollection as to the dates and details of events under Fed. R. Evid. 612; if the notes fail to refresh Meyer's recollection, she might still be able to read the notes into evidence as a past recollection recorded under Fed. R. Evid. 803(5). See Fraser v. Goodale, 342 F.3d 1032, 1037 (9th Cir. 2003) (holding that diary entries could be

considered on summary judgment because their contents could be presented in admissible form at trial). Accordingly, the Court may consider Myers's notes in deciding the summary judgment motion.

### B. 42 U.S.C. § 1983

Section 1983 creates a federal cause of action against local governments and government agents for civil rights violations. In this case, Meyer first claims that the defendants violated her rights under the Fourteenth Amendment by depriving her of property without due process law. This claim depends on the idea that Meyer had a property right in continued employment with the Township.

The existence of a property right to continued employment is a matter of state law. Bishop v. Wood, 426 U.S. 341, 345-47 (1976). Under Michigan law, employment contracts of indefinite duration are presumptively terminable at the will of either party. Lynas v. Maxwell Farms, 273 N.W. 315, 316 (Mich. 1937). To overcome this presumption of at-will employment, a party must present sufficient proof either of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause, or a promise implied in fact on either of these points. Rowe v. Montgomery Ward, 473 N.W.2d 268, 271 (Mich. 1980).

Meyer argues that the collective bargaining agreement between the Township and AFSCME Local 1917 makes her terminable only for just cause. Article 12 of that agreement provides: "[t]he employer agrees that all disciplinary action or discharge shall be for just cause." Article 13 says that "[n]ew employees hired in the bargaining unit *or promoted from the hourly bargaining unit* shall be on probation for the first one hundred eighty (180) consecutive calendar days of their employment." Further, Article 13

11

provides that probationary employees may be discharged at the sole discretion of the Township and that, in the event of discharge, probationary employees are not entitled to the grievance and arbitration procedure outlined elsewhere in the collective bargaining agreement.

The parties do not dispute that Meyer began work with the Township on March 22, 2005 as an hourly employee; that she was promoted to the salaried position of Fire RMS Supervisor on June 22, 2005; and that she was terminated by the Township Board on November 23, 2005. Since November 23 is less than 180 days after June 22, the plain terms of the contract made Meyer a probationary employee terminable at will.

Meyer attempts to argue that she was taken out of the 180 day probationary period because she was given a union membership card and began paying union dues in September 2005, and because she was given union representation at a meeting with Brennan and Brogowicz. However, she does not explain how these facts are relevant to interpreting the contractual provisions at issue.

Meyer also attempts to argue that under Codd v. Velger, 429 U.S. 624 (1977), she was entitled to notice and a hearing on her discharge, even absent a property interest in continued employment, because the Township created a "false and defamatory impression" of her during the discharge proceedings. This claim is hard to fathom in light of Meyer's allegations that she was never informed of the specific reasons for her discharge and that there was no meaningful discussion at the board meeting where she was discharged. The record is utterly devoid of any attempt on defendants' part to defame Meyer. Because Meyer was discharged within the 180-day

probationary period described in the contract, she did not have a property right in continued employment and her claim under § 1983 fails.

### C. Sexual Harassment Under The Elliott-Larsen Civil Rights Act, MCL § 37.2701(a)

In order to make out a *prima facie* case of sexual harassment under the Elliott-Larsen Act, Meyer must show that: (1) she belonged to a protected group; (2) she was subjected to communication or conduct on the basis of sex; (3) she was subjeted to unwelcome sexual contact or communication; (4) the unwelcome sexual contact was intended to or in fact did substantially interfere with her employment or created an intimidating, hostile, or offensive work environment; and (5) under the circumstances, it is appropriate to hold the employer liable. Radtke v. Everett, 501 N.W.2d 155, 162 (Mich. 1993).

As to the first element, Meyer was a member of a protected group. "[A]ll employees are inherently members of a protected class in hostile work environment cases because all persons may be discriminated against on the basis of sex." Radtke, 501 N.W.2d at 162.

Meyer's allegation that Ahonen pinned her against the stove and rubbed up against her, among various other incidents of alleged harassment, suffices to prove the second, third, and fourth elements. The second element is satisfied because Meyer's gender was a but-for cause of Ahonen's harassment against her: "but for her womanhood, [Ahonen] would not have held plaintiff down and attempted to solicit romance, if not sex, from her." Id. at 163. The third element is satisfied because Ahonen's alleged sexual advances were unwelcome; Meyer did not "solicit or incite" the

13

behavior, and she regarded it as "undesirable or offensive." Id. (internal quotation marks omitted). The fourth element is satisfied because a reasonable person, looking at the totality of the circumstances, would have perceived Ahonen's alleged conduct as substantially interfering with Meyer's employment or as having the purpose or effect of creating an intimidating, hostile, or offensive employment environment. Id. at 167. Even a single incident of sexual harassment, if it is sufficiently extreme, may be enough to fulfill the statutory requirement of a hostile work environment. Id. at 168.

Finally, under the last element, an employer may avoid liability "if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment." Id. This employer liability element is satisfied here because Meyer alleges that she reported Ahonen's harassment to Brogowicz and others on numerous occasions, but Brogowicz refused to take action against Ahonen for political reasons.

### D. Title VII

To make out a *prima facie* case of sexual harassment under Title VII of the federal Civil Rights Act, Meyer must demonstrate that: (1) she was a member of a protected class, (2) she was subject to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the harassment created a hostile work environment, and (5) the employer is vicariously liable. Williams v. General Motors Corp., 187 F.3d 553, 560 (6th Cir. 1999). The parties agree that the Title VII claim is against the Township only; Title VII does not allow for an action against individual defendants.

The analysis of Meyer's Title VII claim largely mirrors that of her claim of discrimination under the Elliott-Larsen Act.  As a woman, Meyer is a member of a protected class.  She alleges that Ahonen made unwelcome sexual advances toward her.  Meyer's gender was presumably a but-for cause of Ahonen's alleged behavior.  The conduct alleged is sufficiently severe to create a genuine issue of material fact as to whether Meyer suffered a "hostile work environment."  See generally Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1988).  Finally, Meyer's allegation that Brogowicz and others refused to take action against Ahonen creates a genuine issue as to whether the employer "took reasonable care to prevent and correct any sexually harassing behavior."  Williams v. General Motors Corp., 187 F.3d 553, 561 (6th Cir. 1999).

### E. Retaliation Under The Elliott-Larsen Civil Rights Act, MCL § 37.2701(a)

MCL § 37.2701 provides:

> Two or more persons shall not conspire to, or a person shall not: (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

To establish a *prima facie* case of retaliation under the statute, a plaintiff must prove that: (1) she engaged in protected activity, (2) the protected activity was a significant factor in an adverse employment decision.  Booker v. Brown & Williamson Tobacco Corp., 879 F.2d 1304, 1310 (6th Cir. 1989).

Meyer's retaliation claim centers on her allegation that, in his letter to the EEOC, Brogowicz listed Meyer's prior involvement in a sexual harassment suit against the City of Center Line, Michigan, as a reason for her discharge.  Meyer's allegation is highly

15

misleading. Brogowicz did not cite the mere fact that Meyer sued Center Line as a reason for her discharge. Rather, he stated that Meyer had submitted false and/or misleading information on her employment application regarding her previous employment with Center Line. The Brogowicz letter therefore does not raise an inference of retaliation.

Meyer also argues that in his deposition, Brennan gave reasons for Meyer's discharge inconsistent with the reasons stated in Brogowicz's letter to the EEOC. This is not accurate: Brennan and Brogowicz agree that the primary reason for Meyer's discharge is that she was unable to bring the RMS software online in a timely fashion. Meyer has done nothing to discredit this legitimate, nonretaliatory reason for her discharge. Meyer also fails to cast doubt on any of the subsidiary reasons for her discharge listed in Brogowicz's letter. Therefore, defendants are entitled to summary judgment on Meyer's claim of retaliation under the Elliott-Larsen Act.

## V. Conclusion

For the reasons stated above, defendants' motion for summary judgment is GRANTED with respect to Meyer's claim under § 1983 and her claim of retaliation under the Elliott-Larsen Act. Defendants' motion is DENIED with respect to Meyer's claims of discrimination under Title VII of the federal Civil Rights Act and the Elliott-Larsen Act.

SO ORDERED.

_____

Dated: May 14, 2008                             s/Avern Cohn
                                                AVERN COHN
                                                UNITED STATES DISTRICT JUDGE

16

**07-14953 Meyer v. Macomb Township, et al**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, May 14, 2008, by electronic and/or ordinary mail.

                                                s/Julie Owens
                                                Case Manager, (313) 234-5160